Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
BRODSKY & SMITH, LLC
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160

*Counsel for Plaintiff Luke Delgadillo Garcia*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUKE DELGADILLO GARCIA, | ) Civil No. |
| | ) |
| Plaintiff, | ) |
| vs. | ) **COMPLAINT FOR DECLARATORY** |
| | ) **AND INJUNCTIVE RELIEF AND** |
| MILLER CASTINGS, INC., | ) **CIVIL PENALTIES** |
| | ) |
| Defendant. | ) (Federal Water Pollution Control Act, 33 |
| | ) U.S.C. § 1251 et seq.) |
| | ) |
| | ) |
| | ) |

Plaintiff Luke Delgadillo Garcia ("Plaintiff"), by and through his counsel, alleges as follows:

1.    This is a citizen suit, brought pursuant to the section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by defendant Miller Castings, Inc. ("Miller Castings" or "Defendant") arising out of operations at Miller Castings' facilities located at 12251 Coast Drive, Whittier, CA 90601 and 2503 Pacific Park Dr., Whittier, CA 90601 (the "Facilities").

2.     Since at least August 19, 2011, Defendant has been discharging and continues to discharge polluted stormwater from the Facilities in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and in violation of the General Industrial Stormwater Permits issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "Industrial Stormwater Permit" or "IGP").

3.     Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendant's repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5.     On August 19, 2016, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendant for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Los Angeles Region ("Regional Board") collectively, "state and federal agencies") and Defendant.

6.     The Notice Letter provided Defendant with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendant violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact

1  information for the Plaintiff and Plaintiff's Counsel.  A copy of the Notice Letter is
2  attached as Exhibit 1.

3          7.       More than sixty (60) days have passed since the notice of the alleged
4  violation was served upon Defendant and the state and federal agencies.  During this
5  time, neither the EPA, nor the State of California, has commenced or is diligently
6  prosecuting a court action to redress the violations alleged herein.  No claim in this
7  action is barred by any prior administrative action pursuant to section 309(g) of the
8  CWA, 33 U.S.C. § 1319(g).

9          8.       During settlement negotiations preceding the filing of this complaint, and
10 which are still ongoing, the Parties agreed to toll the statute of limitation regarding this
11 matter to November 17, 2017.

12         9.       Venue is proper in the Central District of California pursuant to section
13 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is
14 located within this judicial district.

15                                          **PARTIES**

16         10.      Plaintiff is a citizen of the State of California who, through his recreational
17 activities, uses and enjoys the waters of the San Gabriel River, their inflows, outflows,
18 and other waters of the San Gabriel River Watershed.  Plaintiff's use and enjoyment of
19 these waters is negatively affected by the pollution caused by Defendant's operations.
20 Plaintiff is dedicated to protecting the water quality of the San Gabriel River and the
21 overall San Gabriel River Watershed for the benefit of its ecosystems and communities.
22 To further these goals, Plaintiff actively seeks federal and state agency implementation
23 of the CWA, and, where necessary, directly initiates enforcement actions on behalf of
24 himself and for his community.

25         11.      Plaintiff, like other citizens, taxpayers, property owners, and residents of
26 his community, lives, works, travels near, and recreates in the San Gabriel River, its
27 tributaries, and the overall San Gabriel River Watershed, into which Defendant
28

discharges pollutants.  Plaintiff, like other citizens, taxpayers, property owners, and residents, uses and enjoys the San Gabriel River, its tributaries, and the overall San Gabriel River Watershed for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendant's discharges of stormwater containing pollutants impairs each of these uses.  Thus, Plaintiff's interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the Industrial Stormwater Permit.

12.     Specifically, in the Spring/Summer of 2016 and in 2017, Plaintiff enjoyed going to the Whittier Narrows Recreation Area (the "Park") by himself and with his family.  Plaintiff enjoys relaxing in the park and walking along walking path in the Park.

13.     The San Gabriel River runs immediately adjacent to the Park.  While at the Park, Plaintiff has witnessed the polluted nature of the San Gabriel River as it runs through the park.  He has observed that the river appears both brown and dirty.  In addition to his visual observation of the water, Plaintiff has also noticed an unpleasant smell coming from the water.

14.     Plaintiff is aware that Defendant's Facilities are upstream from the Park and that the pollution from the Facilities flows downstream through the San Gabriel River and the Park.  Plaintiff believes that this has degraded the beauty of the Park and curtailed his enjoyment of the Park.

15.     Plaintiff intends to return to the Park in the future and believes that reducing Defendant's pollution of the San Gabriel River will improve the water quality in the San Gabriel River and allow him the opportunity to better enjoy the recreational and aesthetic interests in the San Gabriel River and the Park.

16.     Defendant Miller Castings, Inc. is an active California corporation with principle offices located at 2503 Pacific Park Drive, Whittier, CA 90601.

PLAINTIFF'S COMPLAINT

17.     Miller Castings, owns and operates the Facilities in question, located at 12251 Coast Drive, Whittier, CA 90601 and 2503 Pacific Park Drive, Whittier, CA 90601.

18.     Defendant's Facilities are located at 12251 Coast Drive, Whittier, CA 90601 and 2503 Pacific Park Drive, Whittier, CA 90601, and operate as manufacturing plants for nickel, cobalt, steel, and aluminum castings used in the aerospace and industrial gas turbine industries.  Activities carried out at the Facilities include (i) wax casting injection molding; (ii) use of air compressors; (iii) use and storage of caustic chemicals; (iv) waste and product material storage; (v) metal foundry related activities; (vi) metal grinding and finishing; (vii) storage of hazardous waste; (viii) intake and delivery of products and other materials; (ix) welding; (x) x-ray processing.  Repair and maintenance activities carried out at the Facilities include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

19.     The Facilities are listed as operating under SIC Code 3324 relating to Iron and Steel Foundries.  Defendant applied for coverage under the California Industrial Stormwater Permit for the Coast Drive Facility on March 28, 2014, and was issued WDID No. 4 19I024769.  Defendant reapplied for coverage for the Coast Drive Facility under the 2015 Industrial Stormwater Permit on June 4, 2015, and was granted the continued use of its previously issued WDID No.  Defendant applied for coverage under the California Industrial Stormwater Permit for the Pacific Park Drive Facility on June 15, 2010, and was issued WDID No. 4 19I022672.  Defendant reapplied for coverage for the Pacific Park Drive Facility under the 2015 Industrial Stormwater Permit on August 3, 2015, and was granted the continued use of its previously issued WDID No.  The aforementioned, "Notice of Intents" for the Facilities to comply with the terms of the Industrial Stormwater Permit list "Miller Castings Inc" as the Facility

1 name and Operator name of the Facilities.  Plaintiff is therefore informed and believes
2 and thereon alleges that Defendant owns and/or operates the Facilities.

3 ## REGULATORY BACKGROUND

4 ### The Problem of Stormwater Pollution

5     20.    Stormwater runoff is one of the most significant sources of water pollution
6 in the nation and has been recognized as a leading cause of significant and cumulative
7 harmful impacts to the water quality of the San Gabriel River, its tributaries, and the
8 overall San Gabriel River Watershed.  With every rainfall event, significant amounts
9 of polluted rainwater flow from local industrial facilities, such as the Facilities, and
10 pour into storm drains, local tributaries, and into the San Gabriel River, its tributaries,
11 and the overall San Gabriel River Watershed.

12     21.    Stormwater runoff from industrial sites such as the Facilities causes harm
13 to humans and aquatic life.  In particular, stormwater can contain heavy metal
14 pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and
15 zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite
16 nitrogen.  Exposure and ingestion of heavy metals can cause health problems in people
17 and aquatic animals, including neurological, physiological, and reproductive effects.
18 Heavy metals have been shown to alter activity in tissues and blood of fish.

19     22.    High concentrations of total suspended solids ("TSS") degrade optical
20 water quality by reducing water clarity and decreasing light available to support
21 photosynthesis.  TSS has been shown to alter predator/prey relationships (for example,
22 turbid water might make it difficult for fish to see their prey).  Deposited solids alter
23 habitat for fish, aquatic plants, and benthic organisms.  TSS can also be harmful to
24 aquatic life because numerous pollutants, including metals and polycyclic aromatic
25 hydrocarbons ("PAHs"), are absorbed onto TSS.  Thus, higher concentrations of TSS
26 mean higher concentrations of toxins associated with those sediments.  Inorganic
27 sediments, including settleable matter and suspended solids, have been shown to
28

negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

23.   CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA requirements.  Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

24.   CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges.  In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State.  The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

25.   CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

26.   CWA section 301(b) required that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

27.   CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

28.     CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

29.     CWA violators are subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

***State Regulations***

30.     Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.   The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  *See* 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

31.     The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

32.     Water Quality Standards ("WQS") applicable to Defendant are set forth in the California Toxic Rule ("CTR")[1] and Chapter 3 of the Los Angeles Region (Region 4) Water Quality Control Plan (the "Basin Plan").  Exceedances of WQS constitute violations of the Industrial Stormwater Permit, the CTR, and the Basin Plan.

33.     The Basin Plan establishes WQS for all Inland Surface Waters of Los Angeles and Ventura Counties, including but not limited to the following:

a.     Waters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial users;

---

[1] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).

b.    Waters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses.  Increases in natural turbidity attributable to controllable water quality factors shall not exceed 20% where natural turbidity is between 0 and 50 nephelometric turbidity units ("NTU"), and shall not exceed 10% where the natural turbidity is greater than 50 NTU;

c.    All waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life; and

d.    Surface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use.

34.    In addition, the EPA has promulgated WQS for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which include and apply to the San Gabriel River, its tributaries, and the overall San Gabriel River Watershed, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

***The Industrial Stormwater Permit***

35.    In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  On April 17, 1997, the State Board adopted the 1997 Permit, which was in effect through June 30, 2015.  On July 1, 2015, the 2015 Permit became effective and superseded the 1997 Permit, except for enforcement purposes.[2]  To discharge stormwater lawfully in California, industrial dischargers must secure coverage under

---

[2] Notably, the 2015 Permit is much more comprehensive than its predecessor, including expanding its purview to "light industry" uses previously exempted, and including more prescriptive requirements for various parts of permit compliance, including BMPs, NALs, SWPPP requirements, Total Daily Maximum Loads for receiving waters, amongst others.  *See generally,* 2015 Permit.

the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.  1997 Permit, p. II; 2015 Permit, Section I(A)(Findings 8, 12).

36.    The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).  Violations of the Industrial Stormwater Permit are also violations of the CWA.  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

37.    The Industrial Stormwater Permit contains certain absolute prohibitions. The Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States.  1997 Permit, Order Part A(1); 2015 Permit, Section III(B).  The Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance (1997 Permit, Order Part A(2); 2015 Permit, Sections III(C), VI(C)) and discharges that adversely impact human health or the environment (1997 Permit, Order Part C(1); 2015 Permit, Section VI(B)).  Finally, the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  1997 Permit, Order Part C(2); 2015 Permit, Section VI(A).

38.    On April 1, 2014, the State Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, effective as of July 1, 2015.  As of the effective date, Water Quality Order No. 2014-57-DWQ supersedes and rescinds the current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ, except for purposes of enforcement actions brought pursuant to the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ.

39.     Under the CWA and the Industrial Stormwater Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution.  33 U.S.C. § 1311(b); 1997 Permit, Order Part B(3); 2015 Permit, Section X(H).     The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards.  Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

40.     The 2015 Permit includes Numeric Action Limits (NALs) that are based on Benchmarks.  2015 Permit, Section I(M) (Finding 62).  Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility."  *Id.*  Section I(M) (Finding 61).

41.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.  1997 Permit, Section A(1)(a) and Order Part E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges.  1997 Permit, Section A(2); 2015 Permit, Section X(H).  The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT.  1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A).

42.     The SWPPP must include:  a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP.  1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

43.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times.  1997 Permit, Section C(5); 2015 Permit, Section XXI(F).

44.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness.  1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

45.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility.  1997 Permit, Section B(1)-(2) and Order Part E(3).  The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit.  *Id*. at Section B(2).  The MRP must ensure that practices at the facility to prevent or reduce

pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id.*

46.    Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges form the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

47.    The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit.  2015 Permit, Sections I(J) (Findings 55-56); XI.

48.    Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

49.    Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges.  1997 Permit, Sections B(3)-(4); 2015 Permit, Section XI(A).  Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility. 1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4)-(5). As a part of MRP, these collections and analyses must be conducted twice a year; samples must be collected during "the first hour of discharge from (1) the first storm event of the wet

season, and (2) at least one other storm event in the wet season." *Id.* Through the 2014-2015 reporting period, facility operators were required to analyze stormwater samples for pH, total suspended solids, total organic carbon (or oil and grease as a substitute), specific conductance, toxic chemicals, and other pollutants which are likely to be present in significant quantities in stormwater discharging from the facility. 1997 Permit, Section B(5).

50.    Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

51.    The EPA has established the Benchmark values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See*, U.S. EPA 2008 Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "2008 MSGP").  These Benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  Notably, the Benchmark levels contained in the 2008 MSGP is "consistent" with the BMPs required of facilities under the Industrial Stormwater Permit. 2015 Permit I(D)(33).  The following EPA Benchmarks have been established for pollution parameters applicable to the Facilities at issue in this action are (i) Total Suspended Solids ("TSS") – 100 Mg/L; (ii) Total Iron – 1.0 Mg/L; (iii) Total Aluminum – 0.75 Mg/L; (iv) Total Copper – 0.0038-0.0332 Mg/L[3]; and (v) Total Zinc – 0.04-0.26 Mg/L[4].

52.    These Benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").  The 2015 Permit incorporates annual NALs, which are

---

[3] Dependent on the hardness range of the receiving water.
[4] Dependent on the hardness range of the receiving water.

derived from a Water Board dataset.  The following NALs have been established under the 2015 Permit: (i) Total Suspended Solids ("TSS") – 100 Mg/L; (ii) Total Iron – 1.0 Mg/L; (iii) Total Aluminum – 0.75 Mg/L; (iv) Total Copper – 0.0038-0.0332 Mg/L[5]; (v) Total Zinc – 0.04-0.26 Mg/L[6]; and (vi) Oil & Grease ("O&G") – 15.0 Mg/L.  An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  The 2015 Permit also established the following instantaneous maximum NALs: (i) pH – 6.0 – 9.0 s.u.; (ii) TSS – 400 Mg/L; and (iii) O&G – 25 Mg/L.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires revision of the SWPPP and additional BMPs.  If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

53.    Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board.  This requirement is continued with the 2015 Permit.  2015 Permit, Fact Sheet, Paragraph O.

54.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1)

---

[5] Dependent on the hardness range of the receiving water.
[6] Dependent on the hardness range of the receiving water.

and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $51,570 per day per violation for violations occurring after November 2, 2015 and $37,500 per day per violation for violations occurring after January 12, 2009 but before November 2, 2015.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.  *See also* 40 C.F.R. §§ 19.1 -19.4.

## STATEMENT OF FACTS

*Facilities Background*

55.  Defendant operates the Facilities located at 12251 Coast Drive, Whittier, CA 90601 and 2503 Pacific Park Drive, Whittier, CA 90601.

56.  The Facilities are regulated by the Industrial Stormwater Permit.

57.  Defendant submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board for the Coast Drive Facility in 2014 and in 2015.

58.  Defendant submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board for the Pacific Park Drive Facility in 2010 and in 2015.

59.  Operations at the Facilities generally include, but are not limited to i) wax casting injection molding; (ii) use of air compressors; (iii) use and storage of caustic chemicals; (iv) waste and product material storage; (v) metal foundry related activities; (vi) metal grinding and finishing; (vii) storage of hazardous waste; (viii) intake and delivery of products and other materials; (ix) welding; (x) x-ray processing.  Other activities carried out in the regular course of business at the Facilities include: storage of fuel and other oils, maintenance, equipment storage, and waste storage.  Repair and maintenance activities carried out at the Facilities include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.  The Facilities also maintains material storage areas, and waste storage areas.

60.    Some operations at the Facilities occur outdoors and are causing pollutants to be exposed to rainfall.

61.    Vehicles and equipment at the Facilities expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

62.    The types of pollutants that the Facilities releases into the immediate environment are known to include, or have the potential to include, among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, such as, aluminum, iron, copper, zinc, and other pollutants.

63.    The industrial materials stored and the pollutants generated at the Facilities are exposed to stormwater flows.

64.    Activities at the Facilities generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facilities.  During rain events, this pollution washes off of those surfaces and into the San Gabriel River, and the overall San Gabriel River Watershed.  Stormwater from the Facilities discharge into the San Gabriel River and the overall San Gabriel River Watershed.

**Activities Contributing to CWA Violations**

65.    Defendant has not developed and/or implemented an adequate SWPPP at the Facilities.

66.    Defendant has not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facilities.

67.    Defendant has not developed and/or implemented BMPs at the Facilities that adequately control and minimize polluted runoff from the Facilities.

68.    Defendant has not developed and/or implemented BMPs at the Facilities that adequately treat and remove pollutants in stormwater prior to discharge.

69.     Defendant has not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

70.     Defendant has not developed and/or implemented adequate BMPs at the Facilities to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

71.     Defendant has not adequately evaluated and revised the Facilities' SWPPPs to address these failures.  Defendant has also failed to properly operate and maintain the structures and systems that have been put in place at the Facilities to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

72.     Defendant has not developed and/or implemented an adequate MRP at the Facilities.

73.     Defendant's monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facilities.

74.     Defendant's monitoring activities have not effectively identified compliance problems at the Facilities or resulted in effective revisions of the SWPPPs.

75.     Due to Defendant's lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facilities becomes polluted with many constituents.   The potential pollutants from the Facilities include among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, such as, aluminum, iron, copper, zinc, and other pollutants.   Stormwater from the Facilities discharges, via the local storm sewer system and/or surface runoff, directly into the San Gabriel River, and the overall San Gabriel River Watershed.

76.     Polluted stormwater is discharged from the Facilities into the San Gabriel River, and the overall San Gabriel River Watershed.  The San Gabriel River, its tributaries, and the overall San Gabriel River Watershed are waters of the United States.

77.     Defendant's stormwater testing indicates an ongoing pattern of stormwater discharges from the Facilities containing higher than permissible levels of pollutants.  Notably, in the 2015-2016 and 2014-2015 annual reporting periods, Defendant's testing records indicate numerous and frequent instances of high levels of the pollutants iron, copper, zinc, aluminum, and TSS in the Facilities' stormwater discharges.

78.     Moreover, Defendant's stormwater testing for the plethora of required pollutant parameters during the five years before Plaintiff served his Notice of Violations upon was wholly insufficient – the Defendant did not submit a single instance of pollutant testing for the Facilities' stormwater discharges in the 2011-2012, 2012-2013, or 2013-2014, annual reporting periods to the Regional Water Board.  As stated in the Industrial Stormwater Permit, facilities are required to provide testing data, for all requisite NALs, for four Qualifying Storm Events ("QSE's") per year.[7]

79.     Significantly, the pollutants associated with SIC Code 3324 are particularly dangerous to riverine ecosystems, including such heavy metals such as iron, aluminum, copper, and zinc.

80.     This ongoing pattern of high pollutant levels in the Facilities' stormwater dischargers, coupled with the continuous lack of proper testing demonstrates a pattern of noncompliance with the Industrial Stormwater Permit which continues to the present.  Considering that the 2016-2017 rainy period in the Los Angeles region has been one of the wettest on record, with at least twenty-four days of rain in an amount of two-tenths of an inch or greater, this lack of compliance with the Industrial

---

[7] Under the Previous Industrial Stormwater Permit, this requirement was two QSEs per year.

Stormwater Permit on the part of Defendant has had even more opportunity to introduce pollutants into the San Gabriel River and the overall San Gabriel River Watershed.

81.    Due to these numerous insufficiencies, discrepancies, and overages contained in the Defendant's annual stormwater sampling, the Facilities' discharges of stormwater are likely to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT. [8]

## FIRST CAUSE OF ACTION

### Discharges in Violation of Permit Prohibitions of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

82.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

83.    The Industrial Stormwater Permit requires that stormwater discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance; and shall not cause or contribute to a violation of any water quality standards contained in a statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan (collectively, "Prohibitions").

84.    Since at least August 19, 2011, Defendant has been discharging polluted stormwater from the Facilities in violation of the Prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.2 inches or more of rain).  *See* Exhibit 1, Notice Letter at Attachment 3.

85.    The polluted stormwater discharged from the Facilities during every significant rain event contains pollutants harmful to fish, plants, birds, and human

---

[8] Defendant's failures to report NAL testing from 2011 through the present are described in more detail in the Notice, which is attached to this Complaint as Exhibit 1.

health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

86. Discharges of polluted stormwater from the Facilities have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

87. Each day since at least August 19, 2011, that Defendant has discharged polluted stormwater from the Facilities in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

88. By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

89. An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm he has no plain, speedy, or adequate remedy at law.

90. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

91. Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

92. The Industrial Stormwater Permit's SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater

discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

93.     Defendant has discharged and continues to discharge stormwater from the Facilities containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from August 19, 2011 through the present.  Defendant's failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facilities is a violation of the Industrial Stormwater Permit and the CWA.  *See* 1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

94.     Each day since at least August 19, 2011, that Defendant has discharged stormwater containing pollutants in violation of the Industrial Stormwater Permit, specifically Effluent Limitation B(3) of the 1997 Permit, is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

95.     Defendant's CWA violations described in the paragraphs above will continue in the future until Defendant develops and implements BMPs at the Facilities adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

96.     By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

97.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

98.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **THIRD CAUSE OF ACTION**

### **Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. § 1311, 1342)**

99.    Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

100.   The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity.  1997 Permit, Section A(1); 2015 Permit, Section X(B).

101.   Defendant, as of August 19, 2011, has commenced industrial activity and continues to conduct industrial activity at the Facilities.

102.   Defendant has failed and continues to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facilities as required by the Industrial Stormwater Permit.

103.   Defendant has failed and continues to fail to develop or implement a SWPPP for the Facilities that includes BMPs adequate to meet the requirements of the Industrial Stormwater Permit, specifically Section A of the 1997 Permit and Section X of the 2015 Permit.

104.   Defendant has failed and continues to fail to adequately develop or implement a SWPPP at the Facilities that prevents discharges from violating the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit.

105.   Each day since August 19, 2011, that Defendant has failed to adequately develop and/or implement SWPPPs for the Facilities in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

106.   Defendant has been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since August 19, 2011.  Defendant will continue to be in violation of the SWPPP requirements each day that Defendant fails to develop and fully implement an adequate SWPPPs for the Facilities.

107.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

108.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

109.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FOURTH CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program, In Violation of the Industrial Stormwater Permit**
**(Violations of 33 U.S.C. §§ 1311)**

110.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

111.   Defendant has discharged and continues to discharge pollutants from the Facilities in violation of the Industrial Stormwater Permit.  Defendant is also in violation of the Industrial Stormwater Permit for repeated failure to report proper annual stormwater discharge data as required by the Industrial Stormwater Permit.  Thus, Defendant's discharges constitute an unpermitted discharge of pollutants from the Facilities to waters of the United States in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

112.   Defendant has been in violation of CWA section 301(a) every day they have discharged stormwater from the Facilities to waters of the United States since August 19, 2011.  Defendant will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facilities to waters of the United States.

113.   By committing the acts and omissions alleged above, Defendant is subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

114.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

115.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## **RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A.   Declare Defendant to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facilities in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Stormwater Permit;

B.   Enjoin Defendant from discharging pollutants from the Facilities to stormwater discharge points, which discharge to the San Gabriel River, and the overall San Gabriel River Watershed;

Case 2:17-cv-07408-AB-AGR   Document 1   Filed 10/10/17   Page 26 of 26   Page ID #:26

1    C.    Order Defendant to restore all receiving waters damaged by Defendant's

2  illegal discharges of pollutants from the Facilities;

3    D.    Enjoin Defendant from violating sections 301(a) and (b) and section

4  402(p) of the Clean Water Act and from violating the substantive and procedural

5  requirements of the Industrial Stormwater Permit at the Facilities;

6    E.    Order Defendant to pay civil penalties of up to $51,570 per day per

7  violation for violations occurring after November 2, 2015 and $37,500 per day per

8  violation for violations occurring after January 12, 2009 but before November 2, 2015.

9  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4;

10    F.    Award Plaintiff his costs (including reasonable attorney, witness, and

11  consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d);

12    G.    Award such other relief as this Court may deem appropriate.

13  Dated: October 10, 2017                    BRODSKY & SMITH, LLC

14

15

16  By: _____
    Evan J. Smith, Esquire (SBN242352)
17  esmith@brodskysmith.com
    Ryan P. Cardona, Esquire (SBN302113)
18  rcardona@brodskysmith.com
    9595 Wilshire Boulevard, Suite 900
19  Beverly Hills, CA 90212
    Telephone:  (877) 534-2590
20  Facsimile:   (310) 247-0160

21

22  *Attorneys for Plaintiff*

23

24

25

26

27

28

26
PLAINTIFF'S COMPLAINT